SK:FJN/GK/TBM
F.# 2014R01920/OCDETF #NY-NYE-764

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA                                14-CR-625 (S-4) (DLI)

   - against -

DAIRO ANTONIO USUGA DAVID,
   also known as "Otoniel," "Mao,"
   "Gallo" and "Mauricio-Gallo,"

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## THE GOVERNMENT'S DETENTION MEMORANDUM

BREON PEACE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Francisco J. Navarro
Gillian A. Kassner
Tara B. McGrath
Assistant United States Attorneys
(Of Counsel)

Date of Service: May 5, 2022

PRELIMINARY STATEMENT

The government respectfully submits this memorandum in support of its application for a permanent order of detention for the defendant Dairo Antonio Usuga David, also known as "Otoniel," "Mao," "Gallo," and "Mauricio-Gallo," the principal leader of the Colombia-based transnational criminal organization the Clan del Golfo ("CDG"), one of the largest, most violent, and most powerful drug trafficking and paramilitary organizations currently operating in the world.[1]  Usuga David was captured by Colombian authorities on October 23, 2021.  He was extradited from Colombia to the United States last night and is scheduled to appear before the Court this afternoon for an arraignment on the Fourth Superseding Indictment in this case.  See ECF No. 128 (the "Indictment").  For the reasons set forth below, at his arraignment, the Court should enter a permanent order of detention, as no condition or combination of conditions can assure the safety of the public or Usuga David's appearance at trial.

---

[1] The CDG was formerly known as "Los Urabeños," which means "those from Uraba." It was also formerly known as "Clan Usuga," a reference to the fact that the clan was primarily led by members of the Usuga family.  The Colombian government now refers to the organization as Clan del Golfo, meaning the "Gulf Clan."

STATEMENT OF FACTS

I.      The CDG Under the Leadership of Usuga David[2]

Between 2012 and through his capture by Colombian military and law enforcement forces on October 23, 2021, Usuga David was the supreme leader of the CDG.

The CDG is one of the most violent and most powerful criminal organizations in Colombia, and it is one of the largest distributors of cocaine in the world. With as many as 6,000 members at times, the CDG exercises military control over vast amounts of territory in the Urabá region of Antioquia, Colombia, one of the most lucrative drug trafficking areas within Colombia due to its proximity to the Colombia-Panama border and the Caribbean and Pacific coasts. Clad in military uniforms, CDG members employ military tactics and weapons to reinforce their power and incite wars and violence against rival drug traffickers, paramilitary organizations, and Colombian law enforcement authorities who threaten the CDG's control.

The CDG funds its activities primarily through a multi-billion dollar drug trafficking operation. Among other things, it imposes a "tax" on any drug traffickers operating in territory under its control, charging fees for every kilogram of cocaine manufactured, stored, or transported through areas controlled by the organization. The CDG also directly exports cocaine, and coordinates the production, purchase, and transfer of weekly and bi-weekly multi-ton shipments of cocaine from Colombia into Central America and Mexico for ultimate importation to the United States.

---

[2] As permitted by the Second Circuit, the government proceeds by factual proffer in support of its motion for a permanent order of detention. See United States v. LaFontaine, 210 F.3d 125, 130–31 (2d Cir. 2000); United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995). As this proffer seeks only to articulate facts sufficient to justify detention, it is not a complete statement of all the evidence of which the government is aware or which it will seek to introduce at trial.

The volume of drugs exported by the CDG under the leadership of Usuga David is illustrated by multiple drug seizures linked to the organization. For example: (a) on April 12, 2021, approximately 1,365 kilograms (approximately 1.5 tons) of cocaine were seized from two boats off the coast of Panama; (b) on April 14, 2021, approximately 2,609 kilograms (approximately 2.9 tons) of cocaine were seized from a go-fast boat off of the coast of Panama; and (c) on July 18, 2021, approximately 5,463 kilograms (approximately 6 tons) of cocaine were seized from a boat within a jungle region in Colombia.[3]

To maintain control over CDG territory, Usuga David and the CDG employed a veritable army of "sicarios," or hitmen, who carried out acts of violence, including murders, assaults, kidnappings, torture, and assassinations against competitors and those deemed traitors to the organization, as well as their family members. The CDG frequently murdered and assaulted Colombian law enforcement officers, Colombian military personnel, rival drug traffickers and paramilitaries, potential witnesses, and civilians. Usuga David and the CDG used violence to, among other things, promote and enhance the prestige, reputation, and position of the CDG with respect to rival criminal organizations; preserve, protect, and expand the CDG's power and territory; finance the CDG's operations and enrich its leaders through the collection of drug debts; maintain discipline among its members and associates; and protect CDG members from arrest and prosecution by silencing potential witnesses and retaliating against law enforcement authorities and those assisting law enforcement.

The CDG's staggering capacity for violence is illustrated by multiple weapons seizures linked to the organization. For example: (a) on January 24, 2021, weapons linked to the CDG were seized in Medellin, Colombia, including 15 rocket propelled grenades, six Galil rifles,

---

[3] Photographs of the April 14, 2021 seizure are attached hereto as Exhibit A.

4

two M4 rifles, one AK-47 rifle, one Remington rifle, 10 rifle magazines, and over 1,000 rounds of various caliber ammunition; (b) on January 30, 2021, another cache of weapons linked to the CDG was seized in Medellin, Colombia, including five rifles, 10 handguns, one revolver, one handgun silencer, and more than 670 rounds of various caliber ammunition; and (c) on July 28, 2021, additional weapons linked to the CDG were seized in Medellin, Colombia, including five grenade launchers, 31 rifles, 10 semiautomatic handguns, five revolvers, 30 rifle magazines, and 55 rounds of various caliber ammunition.[4]

## II.     Usuga David's Conduct

Usuga David served as a high-ranking leader within the CDG from its inception and was its principal leader for the past ten years. During his reign, Usuga David oversaw all of the CDG's activities and directed its members to engage in extensive criminal acts, including ruthless acts of violence, mandated "strikes" or shutdowns of all business activities and civilian movement within designated regions of Colombia, retaliation against law enforcement authorities and potential witnesses, the exertion of control over drug manufacturing facilities and trafficking routes, and the exportation of cocaine in multi-ton quantities.

Usuga David assumed power and territorial control over vast swaths of the Colombian coastline and personally directed members of the CDG to commit ruthless acts of violence to reinforce that power.[5] This included violence against innocent people and civilians, whom he treated as expendable. For example, in early 2012, following the death of Usuga David's brother, Juan de Dios Usuga David (also known as "Giovanni"), in a police raid, Usuga

---

[4] Photographs of the January 24, 2021 seizure are attached hereto as Exhibit B; photographs of the January 30, 2021 seizure are attached hereto as Exhibit C; and photographs of the July 28, 2021 seizure are attached hereto as Exhibit D.

[5] A map depicting the territories under the CDG's control is attached hereto as Exhibit E.

5

David ordered that a multi-day shutdown or "strike" be imposed on towns and communities within the CDG's control. During the strike, CDG members ordered that all businesses remain closed, and residents stay in their homes. For multiple days, the streets remained empty, as Usuga David ordered CDG members to execute those who did not adhere to his orders.

Usuga David also personally ordered CDG members to commit murders of specific individuals on dozens of occasions, including the murders of rival drug traffickers and members of the CDG who betrayed him or the organization. For example, Usuga David ordered the assassinations of multiple individuals who worked for a rival drug trafficking organization run by Daniel Barrera Barrera.[6] Usuga David also ordered the torture and murder of a CDG member who provided information to Barrera's organization. That individual was subsequently tortured, buried alive, and beheaded post-mortem.

In addition, Usuga David regularly directed CDG members to use violence, intimidation, and murder to dissuade law enforcement authorities from performing their duties and to silence potential witnesses. For example, at Usuga David's direction, the CDG carried out organized campaigns, referred to as "Plan Pistolas," to kill Colombian law enforcement and military personnel using military-grade weapons, including grenades, explosives, and assault rifles. Usuga David also offered bounties for the murder of Colombian police officers and military personnel to intimidate law enforcement authorities and prevent them from capturing

---

[6] Daniel Barrera Barrera manufactured hundreds of tons of cocaine annually in Colombia, trafficked it to various parts of the world, including the United States, and laundered tens of millions of dollars in proceeds from his narcotics trafficking activity. Following his capture in 2012 and extradition to the United States in 2013, Barrera pleaded guilty in the Eastern District of New York to conspiring to launder money, and he pleaded guilty in the Southern District of New York to conspiring to distribute and manufacture cocaine knowing that it would be imported into the United States. The pleas were entered on October 9, 2014, and November 20, 2014, respectively. On July 25, 2016, Barrera was sentenced to 35 years' imprisonment.

him or interfering in the CDG's business. Usuga David's organization also made numerous attempts to assassinate individuals who were believed to be cooperating with law enforcement. For example, CDG members attempted to poison a witness with cyanide while he was imprisoned overseas and attempted to assassinate the witness's attorney.

Finally, Usuga David was extensively involved in the narcotics activities that funded the CDG and enabled its power. Among other things, he oversaw the CDG's drug trafficking exports and directed a network of "debt collectors" tasked with the enforcement and collection of taxes paid by drug trafficking organizations that operated in regions controlled by the CDG. In addition, Usuga David controlled cocaine manufacturing facilities and used the CDG's extensive distribution network to export cocaine independently for his own personal profit.

III.     Foreign Authorities' Arrest and Extradition of Usuga David

For years, Usuga David evaded capture by periodically moving through a network of rural safe houses and refraining from using a cell phone, instead relying on couriers for communication. Usuga David was ultimately arrested on October 23, 2021, in a rural hideout in Antioquia province, Colombia, near the Colombia-Panama border, following an extensive capture operation by Colombian military and law enforcement personnel involving 500 soldiers and 22 helicopters.[7]

On November 4, 2021, a grand jury sitting in the Eastern District of New York returned the Indictment, which spans over 18 years of Usuga David's criminal conduct. Count One charges Usuga David with leading a Continuing Criminal Enterprise ("CCE"), in violation of Title 21, United States Code, Sections 848(a) and 848(c), predicated on 45 violations, for his

---

[7] A photograph of Usuga David taken after his arrest is attached hereto as Exhibit F.

role as the leader of the CDG.  Count Two charges Usuga David with participating in an international conspiracy to manufacture and distribute cocaine, knowing and intending that the narcotics would be illegally imported into the United States, in violation of Title 21, United States Code, Sections 959(d), 960(b)(1)(B)(ii) and 963.  Count Three charges Usuga David with use of firearms in furtherance of his drug trafficking crimes, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(i), 924(c)(1)(A)(ii), 924(c)(1)(A)(iii) and 924(c)(1)(B)(ii).  Counts One and Two carry a statutory maximum of life imprisonment.  Count One carries a mandatory minimum of 20 years' imprisonment, and Count Two carries a mandatory minimum of 10 years' imprisonment.[8]

      Following extradition proceedings based on the Indictment, Usuga David was extradited from Colombia and arrived in the Eastern District of New York earlier today.  He will be presented before the Honorable Vera M. Scanlon for arraignment this afternoon.

---

[8] The government of Colombia granted extradition on Count One, Violations One through Forty-Four, and Count Two.  The government of Colombia did not grant extradition on Count One, Violation Forty-Five, or on Count Three; as such, at this time, the government does not expect to proceed on these aspects of the charges.

ARGUMENT

I.     Legal Standards

Under the Bail Reform Act, 18 U.S.C. §§ 3141 et seq., a federal court must order a defendant detained pending trial where it determines that "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). A presumption of dangerousness and risk of flight arises when a defendant is charged with an offense under the Controlled Substances Act or the Controlled Substances Import and Export Act that carries a maximum term of imprisonment of 10 years or more and the Court finds probable cause to believe that the defendant committed such offense. 18 U.S.C. § 3142(e)(3)(A). Probable cause may be established by the sheer fact that a grand jury has returned an indictment charging the defendant with the offense in question. See United States v. Contreras, 776 F.2d 51, 54–55 (2d Cir. 1985).

The presumption means that the Court must initially assume there is "no condition or combination of conditions that will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3124(e)(3). The defendant may rebut this presumption by coming "forward with evidence that he does not pose a danger to the community or a risk of flight." United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001) (per curiam). If this burden of production is satisfied, the government retains the burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community and by a preponderance of the evidence that the defendant presents a risk of flight. See 18 U.S.C. § 3142(f); Mercedes, 254 F.3d at 436; United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985).

The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).  Indeed—and significantly—danger to the community includes "the harm to society caused by [the likelihood of continued] narcotics trafficking." United States v. Leon, 766 F.2d 77, 81 (2d Cir. 1985).  In considering risk of flight, courts have found that where the evidence of guilt is strong, it provides "a considerable [ ] incentive to flee," Millan, 4 F.3d at 1046, as does the possibility of a severe sentence, see Jackson, 823 F.2d at 7; United States v. Martir, 782 F.2d 1141, 1147 (2d Cir. 1986) (defendants charged with serious offenses with significant maximum terms had potent incentives to flee); see also United States v. Cisneros, 328 F.3d 610, 618 (10th Cir. 2003) (defendant was flight risk because her knowledge of seriousness of charges against her gave her strong incentive to abscond to Mexico).

Courts consider several factors in making the determination of whether pretrial detention is appropriate: (1) the nature and circumstances of the crime charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including family ties, employment, financial resources, community ties, and past conduct; and (4) the nature and seriousness of the danger to any person or the community that would be posed by release.  See 18 U.S.C. § 3142(g).  Even where the defendant has met his burden of production to rebut the statutory presumption in favor of detention, the presumption also remains a factor for the Court to consider.  Mercedes, 254 F.3d at 436.

II.     A Presumption of Detention Applies

This case involves offenses for which there is a presumption that no combination of conditions will reasonably assure Usuga David's appearance or the safety of the community. See 18 U.S.C. § 3142(e)(3). Specifically, because Usuga David is charged with multiple counts under the Controlled Substances Act and the Controlled Substances Import and Export Act for which the maximum term of imprisonment is life, he is presumed to pose a danger to the community and a risk of flight. Accordingly, Usuga David bears the initial burden of showing that he is not a danger to the community or a flight risk. For the reasons set forth below, Usuga David cannot sustain that burden.

III.    Usuga David Is a Danger to the Community

The facts and circumstances of this case compel Usuga David's detention, as all four factors set forth in the Bail Reform Act inescapably show that he poses a danger to the community. The conduct with which Usuga David is charged—leading a continuing criminal enterprise engaged in drug trafficking and brutal acts of violence, and participating in an international cocaine manufacturing and distribution conspiracy—are among the most egregious contemplated by our criminal justice system. For these crimes, Usuga David faces 20-year and 10-year mandatory minimum prison sentences. See 21 U.S.C. §§ 848(a), 960(b)(1)(B)(ii). The scope and continuing nature of Usuga David's criminal conduct—which include the use of extortion, threats, and violence to exercise power over a population and territory and to carry out the production, purchase, taxation, and international shipment of thousands of kilograms of cocaine—demonstrates that he is partly responsible for the steady supply of illicit drugs that flow through and around the United States, and the significantly compromised quality of life the residents of communities within this nation suffer as a result.

The defendant's release poses a danger to the community given the ease with which he can continue to engage in criminal conduct if released by, among other things, directing CDG personnel to engage in narcotics trafficking on his behalf.  See Millan, 4 F.3d at 1048 ("dangerousness" encompasses "'the danger that the defendant might engage in criminal activity to the detriment of the community'" (quoting legislative history)); Leon, 766 F.2d at 81 (dangerousness includes "the harm to society caused by [the likelihood of continued] narcotics trafficking").  That danger is particularly pronounced here given his notorious drug trafficking activities spanning almost 20 years.

Beyond the dangerousness evidenced by his narcotics trafficking, Usuga David directly oversaw and ordered numerous acts of violence carried out by CDG members, including murders, assaults, rapes, kidnappings, torture, and assassinations against Colombian authorities, rival drug traffickers and paramilitaries, and civilians.  In directing the CDG's violent campaign, Usuga David has shown total disregard for human life.  Moreover, the cavalier manner in which Usuga David unleashed such violence without any apparent fear of law enforcement or possible consequences demonstrates that no combination of legal conditions would be sufficient to allay the extraordinary danger he poses.

Finally, the evidence of Usuga David's guilt in leading a continuing criminal enterprise and engaging in narcotics trafficking is overwhelming.  His arrest comes at the end of a longstanding investigation conducted by a number of U.S. agencies and Colombian authorities.  The evidence supporting the charges against Usuga David includes, among other things, Usuga David's own statements, as well as testimony from multiple cooperating witnesses, law enforcement agents, and victims; intercepted communications among members of rival drug

trafficking and paramilitary organizations; drug ledgers and records; and numerous drug and weapons seizures.

In sum, based upon the breadth of Usuga David's international drug trafficking empire, his ability to thwart government and law enforcement efforts to disrupt his criminal activity, and his unrestrained use of violence, releasing Usuga David would undoubtedly present an extraordinary danger to the community. No condition or combination of conditions can assure its safety.

IV.  Usuga David Poses a Significant Risk of Flight

Similarly, Usuga David cannot overcome the presumption that he is a risk of flight. First, his capture was the result of an extensive joint campaign by the Colombian National Police, Colombian Air Force, and National Army of Colombia that began in 2016. Prior to Usuga David's arrest, the Colombian government offered a $800,000 reward for information regarding his whereabouts and the United States offered a $5 million bounty for information leading to his arrest. As described above, for years, Usuga David evaded capture by periodically moving through a network of rural safe houses and refraining from using a cell phone, instead relying on couriers for communication. Usuga David was ultimately captured in a rural hideout in Antioquia province, Colombia, near the Colombia-Panama border, following an operation involving 500 soldiers and 22 helicopters. President Ivan Duque of Colombia described the operation as "the biggest penetration of the jungle ever seen in the military history of our country." Since his capture, Usuga David has been held under rigorous surveillance conditions at a maximum-security facility. He fought his extradition to the United States up until the moment of his departure.

Second, that Usuga David evaded capture for so long, and his actions following his arrest, speak volumes about his readiness and ability to avoid prosecution at all costs. For years, he has been at the helm of the CDG, an extraordinarily powerful and lucrative drug trafficking organization. Should Usuga David be released from custody, he could seek to leverage his connections to high-level CDG members in Colombia to assist him in fleeing from U.S. law enforcement, obtaining shelter overseas, and evading justice in an American courtroom. See United States v. Bruno, 89 F. Supp. 3d 425, 432 (E.D.N.Y. 2015) (observing, in case involving both serious flight risk and danger to community, that detention is appropriate where defendant's "alleged ties to a large criminal syndicate indicate that he has strong connections to people who have the resources to, ability to, and interest in helping him flee the jurisdiction"). In addition, Usuga David has extensive undisclosed wealth from prior drug trafficking and taxation, and the ability to obtain additional revenue from the CDG's ongoing drug trafficking activities, all of which would enable him to orchestrate his flight from justice and sustain himself in hiding, as he did prior to his capture.

Third, if convicted of operating a continuing criminal enterprise as charged in Count One, Usuga David faces a mandatory minimum sentence of 20 years' imprisonment; and if convicted of international narcotics trafficking conspiracy as charged in Count Two, he faces a mandatory minimum sentence of 10 years' imprisonment; both counts carry a statutory maximum of life imprisonment. Given the significant jail time Usuga David faces upon conviction, he has a strong incentive to flee the jurisdiction. See Jackson, 823 F.2d at 7; Martir, 782 F.2d at 1147 (charges with significant maximum terms created potent incentive to flee); Cisneros, 328 F.3d at 618 (seriousness of charges gave defendant strong incentive to abscond). Furthermore, even if Usuga David were to prevail in the instant case, he faces charges in several

14

other jurisdictions of the United States, including the Southern District of Florida and the Southern District of New York. This fact provides Usuga David with an even greater incentive to flee.

Fifth, Usuga David's personal history and characteristics demonstrate that he is a significant flight risk. As previously mentioned, Usuga David oversaw an organization that routinely engaged in brutal acts of violence and overt drug trafficking, and he employed a veritable army of sicarios to physically occupy and control the most lucrative drug trafficking regions within Colombia. While overseeing his organization, Usuga David was personally involved in ordering murders and committing numerous acts of assault. As Usuga David's criminal conduct makes clear, he has no respect for public authority or the rule of law. Thus, there is no reason to believe that Usuga David would obey the Court's orders or conditions of release if the Court granted bail.

Sixth, Usuga David was admitted to the United States for the sole purpose of facing prosecution. He has no legal status in the county. Moreover, prior to today, Usuga David had never traveled to the United States. Usuga David has no apparent family ties to the United States, or any other significant connection to the United States aside from his drug trafficking activities. Given his absence of any connection to the United States and his extensive ties to Colombia, Usuga David constitutes a significant risk of flight.

Finally, any proposed use of home detention and/or electronic monitoring would be wholly inadequate considering all of the foregoing. See United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993) (noting home detention "at best elaborately replicate[s] a detention facility without the confidence of security such a facility instills" (citation and internal quotation marks

15

omitted)); United States v. Zarrab, No. 15 CR 867 (RMB), 2016 WL 3681423, at *10 (S.D.N.Y. June 16, 2016).

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court order the defendant to be detained permanently pending trial, as there is no condition or combination of conditions that could reasonably assure the safety of the community or the defendant's appearance at trial.

Dated: Brooklyn, New York
May 5, 2022

                                        Respectfully submitted,

                                        BREON PEACE
                                        UNITED STATES ATTORNEY
                                        Eastern District of New York
                                        271 Cadman Plaza East
                                        Brooklyn, New York 11201

            By:          /s/
                                        Francisco J. Navarro
                                        Gillian A. Kassner
                                        Tara B. McGrath
                                        Assistant U.S. Attorneys
                                        (718) 254-7000