FJN/GK/TBM
F. #2014R01920/OCDETF# NY-NYE-764

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   - against -

DAIRO ANTONIO USUGA DAVID,
   also known as "Otoniel," "Mao,"
   "Gallo," and "Mauricio-Gallo,"

     Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**PARTIAL SEALING REQUESTED**

14-CR-625 (DLI) (S-4)


MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION TO VACATE OR
<u>MODIFY SPECIAL ADMINISTRATIVE MEASURES</u>


        BREON PEACE
        United States Attorney
        Eastern District of New York
        271A Cadman Plaza East
        Brooklyn, New York 11201


Francisco J. Navarro
Gillian A. Kassner
Tara B. McGrath
Assistant United States Attorneys
(Of Counsel)

Date of Service: June 23, 2023

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ....................................................................................1

BACKGROUND ........................................................................................................2

    I.    Factual Background and the Charged Offenses........................................................2

    II.   Procedural History and SAMs Implementation.........................................................5

ARGUMENT ...........................................................................................................8

    I.    The Court Lacks Jurisdiction to Hear Defendant's Motion Because He Has Failed to Exhaust His Administrative Remedies ................................................................8

    II.   The SAMs Are Appropriate and Are Being Constitutionally Implemented...........13

        A.    The SAMs Are Constitutional and Valid Under Established Law ............13

        B.    The SAMs Are Reasonably Related to a Legitimate Penological Interest .16

        C.    The Other Turner Factors Also Support Maintaining the SAMs...............19

    III.   The SAMs Restrictions Are Prisoner-Specific .......................................................20

    IV.   The Defendant is Not Entitled to an Evidentiary Hearing.......................................21

CONCLUSION.........................................................................................................22

## PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in opposition to the defendant Dairo Antonio Usuga David's (the "defendant") motion to vacate or, in the alternative, modify the Special Administrative Measures ("SAMs") dated June 2, 2023 ("Def. Br.") and the defendant's Supplemental Memorandum dated June 10, 2023 ("Def. Supp. Br."). Specifically, the defendant requests that he be permitted to join the general prison population or, in the alternative, that he be given greater access to his family and additional medical attention. The defendant also requests an evidentiary hearing.

At base, the defendant argues that the SAMs are no longer required in light of his guilty plea, and that their continued implementation violates his constitutional right to due process. As set forth below, the defendant's arguments are meritless and his motion should be denied in its entirety. The defendant's case plainly warrants SAMs, which have been appropriately and constitutionally applied. Until his capture in the jungles of Colombia, the defendant was the supreme leader of the Clan del Golfo ("CDG"), one of the most violent and powerful criminal drug trafficking and paramilitary organizations in the world. At the defendant's direction, the CDG used kidnapping, torture, and murder to exact revenge on those deemed disloyal and to silence potential witnesses. For his conduct, the defendant has been convicted of engaging in a Continuing Criminal Enterprise ("CCE") and awaits sentencing. Given the defendant's extraordinarily violent history, and his criminal conviction, there remains a substantial risk that the defendant's communications with the CDG and certain other third parties could result in death or serious bodily injury to others, including of individuals who the defendant believes aided the government's investigation against him and who were to serve as potential witnesses.

1

BACKGROUND

I.      Factual Background and the Charged Offenses

The CDG is one of the most violent and most powerful criminal organizations in Colombia, and one of the largest distributors of cocaine in the world.   With as many as 6,000 members at times, the CDG exercises military control over vast amounts of territory in the Urabá region of Antioquia, and employs military tactics and weapons to reinforce its power against rival drug traffickers, paramilitary organizations, and Colombian law enforcement authorities who threaten the CDG's control.   The CDG funds its activities primarily through a multi-billion-dollar drug trafficking operation, charging fees for every kilogram of cocaine manufactured, stored, or transported through areas controlled by the organization and by exporting its own cocaine, including to the United States.[1]

The defendant served as a high-ranking leader within the CDG from its inception and was its principal leader from 2012 until his capture in 2021.   During his reign, the defendant oversaw all the CDG's activities and directed its members to engage in extensive criminal acts. The defendant and the CDG used violence to, among other things: (1) protect CDG members from arrest and prosecution; silence potential witnesses and retaliate against law enforcement authorities and those assisting law enforcement; (2) maintain discipline among its members and associates; (3) promote and enhance the prestige, reputation, and position of the CDG with respect to rival criminal organizations; (4) preserve, protect, and expand the CDG's power and

---

[1] The volume of drugs exported by the CDG under the defendant's leadership is illustrated by multiple drug seizures linked to the organization.   In the second quarter of 2021, approximately 10.4 tons of cocaine were seized in connection with just three seizures.   See ECF Dkt. No. 148 ("Detention Mem.") at 4 & Ex. A.   Moreover, during the defendant's plea allocution, he acknowledged that at his direction, the CDG collected taxes on at least 96,856 kilograms, or 96.856 tons, of cocaine.   Tr. dated Jan. 25, 2023 ("Guilty Plea") at 54:6-12.

territory; and (5) finance the CDG's operations and enrich its leaders through the collection of drug debts.   To help carry out this violence, the defendant and the CDG employed a veritable army of "sicarios," or hitmen, who kidnapped, tortured, and murdered competitors and those deemed traitors to the organization, as well as their family members.   The CDG's armories were staggering.   In the first half of 2021 alone, law enforcement seized grenade launchers, rocket propelled grenades, assault rifles, and hundreds of rounds of ammunition, among other weapons. See Detention Mem. at 5 & Ex. B-D.   Its victims included Colombian law enforcement and military personnel, rival drug traffickers and paramilitaries, potential witnesses, and civilians.

The defendant's reign was marked by his deep penchant for revenge.   In early 2012, after the defendant's brother, Juan de Dios Usuga David (also known as "Giovanni"), was killed in a police raid, the defendant ordered a multi-day shutdown, or "strike," on towns and communities within the CDG's control.   Residents remained at home and business owners kept their establishments closed under fear of execution.   On a separate occasion, at the defendant's instruction, a CDG member—who was believed to have provided information to a rival drug trafficking organization run by Daniel Barrera Barrera—was tortured, buried alive, and beheaded post-mortem for his perceived disloyalty.

Moreover, at the defendant's direction, the CDG carried out organized campaigns, referred to as "Plan Pistolas," to kill Colombian law enforcement and military personnel using military-grade weapons, including grenades, explosives, and assault rifles.   The defendant offered bounties for the murder of Colombian police officers and military personnel to intimidate law enforcement authorities and prevent them from capturing him or interfering in the CDG's business.   Indeed, following the defendant's extradition in connection with the instant case, the

CDG embarked on an armed shutdown of 11 of Colombia's 32 regional departments, which resulted in five murders—including of two police officers and one solider—as well as attacks on police stations and blockages of roadways and public transportation systems.

Further, the defendant's organization made numerous attempts to assassinate individuals who were believed to be cooperating with law enforcement, including in connection with the instant case. For example, CDG members attempted to poison a potential government witness with cyanide while that individual was imprisoned in Colombia and also attempted to assassinate the witness's foreign attorney.

For years, Usuga David evaded capture by periodically moving through a network of rural safe houses and refraining from using a cell phone, instead relying on couriers to help him communicate with CDG members, who would then carry out his instructions and run his enterprise. Usuga David was ultimately arrested on October 23, 2021, in a rural hideout in Antioquia province, Colombia, near the Colombia-Panama border, following an extensive capture operation by Colombian military and law enforcement personnel involving 500 soldiers and 22 helicopters. See Detention Mem. at 7 & Ex. F.

On November 4, 2021, a grand jury sitting in the Eastern District of New York returned the Fourth Superseding Indictment (the "Indictment") in this case. The Indictment, which spans almost two decades of the defendant's criminal conduct, charges the defendant in Count One with engaging in a CCE, in violation of Title 21, United States Code, Sections 848(a) and 848(c), predicated on 45 violations, for his role as the leader of the CDG. Count Two charges the defendant with participating in an international conspiracy to manufacture and distribute cocaine, knowing and intending that the narcotics would be illegally imported into the

United States, in violation of Title 21, United States Code, Sections 959(d), 960(b)(1)(B)(ii) and 963. Count Three charges the defendant with use of firearms in furtherance of his drug trafficking crimes, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(i), 924(c)(1)(A)(ii), 924(c)(1)(A)(iii) and 924(c)(1)(B)(ii).

II.     Procedural History and SAMs Implementation

On May 4, 2022, Colombia extradited the defendant to the United States and the Honorable Vera M. Scanlon, United States Magistrate Judge for the Eastern District of New York, arraigned the defendant the following day. See ECF Dkt. No. 150. Judge Scanlon entered a permanent order of detention and, since that time, the defendant has been incarcerated at the Metropolitan Detention Center ("MDC") in Brooklyn, New York. See ECF Dkt. No. 152. On June 2, 2022, the Court held the first status conference in the case and designated the case as complex for Speedy Trial purposes. On January 25, 2023, the defendant pled guilty before Your Honor to Count One of the Indictment, charging the defendant with engaging in a CCE, which carries a statutory maximum of life imprisonment and a mandatory minimum sentence of 20 years' imprisonment.[2] The defendant is scheduled to be sentenced on August 8, 2023.

In light of the defendant's prior use of third parties to carry out acts of violence against potential witnesses and those deemed disloyal, and to exercise control over the CDG, the government sought the implementation of SAMs pursuant to 28 C.F.R. § 501.3.

---

[2]  At the same appearance, the defendant pled guilty to Count Two of the indictment in United States v. Dairo Antonio Usuga David, 15-CR-20403-WPD(s) (S.D.F.L.), charging a maritime narcotics conspiracy in violation of 46 U.S.C. §§ 70506(b), 70506(a) and 21 U.S.C. § 960(b)(1)(B), and Count Two of the indictment in United States v. Dairo Antonio Usuga David et al., 04-CR-962 (LAP) (S.D.N.Y.), charging a narcotics importation conspiracy in violation of 21 U.S.C. § 963. See United States v. Dairo Antonio Usuga David, 23 CR 21 (DLI), (E.D.N.Y.); United States v. Dairo Antonio Usuga David, 23-CR-27 (DLI) (E.D.N.Y.).

On May 18, 2022, approximately two weeks after the defendant's arraignment, the Deputy Attorney General Lisa Monaco approved the imposition of SAMs for one year, pursuant to 28 C.F.R. § 501.3, based on the substantial risk that the defendant's communications with people inside or outside of the prison could result in death or serious bodily injury, or substantial damage to property that would entail the risk of death or serious bodily injury.[3]   See First SAMs Mem. at 1 (attached hereto as Exhibit A).   The SAMs are reasonably necessary to prevent the defendant from committing, soliciting, or conspiring to commit additional criminal activity.   See id. at 1-4.   The SAMs mitigate this risk of criminal activity by restricting the defendant's access to the mail, the media, the telephone, and third parties.   See id. at 4.

Notwithstanding the limits regarding third-party contacts, the SAMs clearly permit counsel, pre-cleared staff, and interpreters to communicate with the defendant in a variety of ways to prepare his defense.   See id. at 5-6, ¶ 2 ("Attorney-Client Provisions"); id. at 7, ¶ 2e ("Unaccompanied Attorney's Precleared Paralegal(s) May Meet With Client"); id. at 7, ¶ 2f ("Simultaneous Multiple Legal Visitors"); id. at 7, ¶ 2g ("Legally Privileged Telephone Calls"); id. at 9, ¶ 2h ("Documents Provided by Attorney to Inmate"); id. at 9-10, ¶ 2i ("Legal Mail"). Counsel and counsel's staff are required to sign affirmations agreeing to comply with the SAMs restrictions, including not to forward third-party messages to or from the defendant unless necessary for purposes of preparing the defense.   See id. at 5, ¶ 2a; id. at 7, ¶ 2d; id. at 12, ¶ 2f.

The SAMs also permit the defendant to have telephone calls ("Family Calls") and visits with immediate family members—his spouse, children, parents, and siblings—that are

---

[3] The Deputy Attorney General has authority to approve the imposition of SAMs pursuant to 28 C.F.R. § 0.15(a).

contemporaneously monitored by the FBI.[4]   See id. at 10, ¶ 3a; id. at 11, ¶ 3d; id. at 12, 3f.   The

Family Calls cannot "be overheard by a third party," "be patched through, or in any manner

forwarded or transmitted, to a third party," "be divulged in any manner to a third party," or "be in

any manner recorded or preserved," except by duly authorized federal authorities.[5]   Id. at 10,

¶ 3b.

The SAMs provide that "[t]he quantity and duration of the [Family Calls] shall be

set by the [U.S. Marshals Service/Bureau of Prisons/Detention Facility], with a minimum of one

call per month."   Id. at 10, ¶ 3a.   To date, the defendant has had 14 Family Calls with his wife

and daughters on the following dates:

- two calls on August 12, 2022;

- one call on September 13, 2022;

- one call on October 4, 2022;

- one call on November 1, 2022;

- one call on December 13, 2022;

---

[4] However, the SAMs preclude the defendant from having contact with his sister
Nini Johanna Usuga David, who was recently convicted of conspiracy to distribute cocaine in
violation of 21 U.S.C. §§ 963 and 960(b)(1)(B) in United States v. Nini Johanna Usuga-David, 18-
CR-20948-DPG (S.D.F.L.).

[5] Notably, in defiance of the SAMs, the defendant has passed messages through
his wife and apparently his attorneys.   In detailing an interview with the defendant, the
Presentence Investigation Report ("PSR") dated May 25, 2023 provides: "He and his current wife,
Eva Luz Teran [ ], are able to speak and she passes along information provided by the defendant
and his attorneys to the rest of the family."   PSR ¶ 114.   It also states: "The defendant has
received messages from his children on how they are coping with the current situation and has
sent back messages for them to remain united during this time.   He has encouraged them to take
care of each other and maintain the relationships they have had with one another over the years."
Id. ¶ 122.

- one call on January 3, 2023;

- two calls on March 13, 2023;

- two calls on April 11, 2023;

- two calls on May 9, 2023; and

- two calls on June 13, 2023.

On May 15, 2023, the Deputy Assistant Attorney General Jennifer Hodge approved the imposition of SAMs for a second year, with the same conditions as above.[6]  <u>See</u> Second SAMs Mem. at 1-2 (attached hereto as Exhibit B).   On June 2, 2023, the defendant filed the motion to vacate the SAMs, which would allow him to join the general population at the MDC, or in the alternative to modify the SAMs to permit him to communicate more frequently with his family and to access medical treatment.   <u>See</u> Def. Br. 1, 8.   The defendant also requests an evidentiary hearing under <u>Turner v. Safley</u>, 482 U.S. 78 (1987).   <u>See</u> Def. Br. at 8.

ARGUMENT

I.   <u>The Court Lacks Jurisdiction to Hear Defendant's Motion Because He Has Failed to Exhaust His Administrative Remedies</u>

The defendant's motion to vacate or modify his SAMs should be dismissed because he has failed to exhaust his administrative remedies.[7]

The authority to impose SAMs stems from the Attorney General's authority over the federal penal system, which the Attorney General has delegated to the Bureau of Prisons

---

[6]  Under Order No. 2859-2007, dated January 18, 2007, then Attorney General Alberto R. Gonzales delegated to the Assistant Attorney General of the Criminal Division the authority conferred by 28 C.F.R. § 501.3 to direct the implementation of and to oversee SAMs.

[7]  The defendant also fashions his motion as a habeas petition under 28 U.S.C. § 2241(c).  <u>See</u> Def. Br. at 4.  "Before seeking habeas relief under Section 2241, however,

("BOP").   See, e.g., 18 U.S.C. §§ 3621, 4401(b), 4042.   The BOP establishes the conditions of

confinement for all persons in its custody pursuant to BOP regulations and policies.   The

regulations govern inmate communications and contacts, among other conditions of confinement.

The severity of the conditions of confinement depends upon where the prisoner is housed, as well

as the type of crime for which an individual is incarcerated.   The Attorney General may authorize

the BOP to impose SAMs based on concerns of violence, among other things, pursuant to 28

C.F.R. § 501.3.   The statute itself provides that an "affected inmate may seek review of any

special restrictions" imposed under SAMs "through the Administrative Remedy Program"

established by the BOP.   See 28 C.F.R. § 501.3(e).   See also United States v. Khan, 540 F. Supp.

2d 344, 348 (E.D.N.Y. 2007) (Irizarry, J.) (detailing the Administrative Remedy Program).

        The Prison Litigation Reform Act ("PLRA") expressly states that, "[n]o action

shall be brought with respect to prison conditions under section 1983 of this title, or any other

Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such

administrative remedies as are available are exhausted."   42 U.S.C. § 1997e(a).   The Supreme

Court has held that this jurisdictional requirement, known as "exhaustion," is mandatory.   Porter

v. Nussle, 534 U.S. 516, 524 (2002); see also Booth v. Churner, 532 U.S. 731, 739 (2001).   The

exhaustion requirement applies to all inmate suits about prison life, whether they involve general

circumstances or particular episodes.   Porter, 534 U.S. at 532.   The Supreme Court noted that

Congress described the cases covered by the exhaustion requirement as "action[s] . . . brought

---

prisoners must exhaust any available administrative remedies, or else justify the failure to exhaust
these remedies." Shaw v. Terrell, No. 10-CV-2477 (DLI), 2013 WL 4586581, at *1 (E.D.N.Y.
Aug. 28, 2013) (citing Carmona v. U.S. Bureau of Prisons, 243 F.3d 629, 634 (2d Cir. 2001)).
Because the defendant has failed to exhaust his administrative remedies, his motion should be
dismissed.

with respect to prison conditions." Id. at 525 (alteration in original). The Court reasoned that Congress enacted the broad reaching exhaustion requirement "to reduce the quantity and improve the quality of prisoner suits," noting that this would give corrections officials the "time and opportunity to address complaints internally before allowing the initiation of a federal case." Id. at 516, 525; accord United States v. Al-Marri, 239 F. Supp. 2d 366, 367-68 (S.D.N.Y. 2002) ("The Supreme Court's decision in Porter . . . makes clear that courts should not intervene in matters regarding prison conditions until corrections officials had had the time and opportunity to address such complaints internally.").

The Second Circuit has held that a prisoner must exhaust his administrative remedies before challenging SAMs in federal court. See United States v. Yousef, 327 F.3d 56, 165 (2d Cir. 2003) ("Yousef must exhaust his administrative remedies under the Bureau of Prisons Administrative Remedy Program with regard to whatever special administrative measures are imposed on him."). Numerous courts, including the Supreme Court, have held the same. See Porter, 534 U.S. 516; Booth, 532 U.S. 731; accord United States v. Ali, 528 F.3d 210, 244 (4th Cir. 2008) ("The defendant must exhaust his administrative remedies before challenging the SAMs in federal court."); Yousef v. Reno, 254 F.3d 1214, 1221-22 (10th Cir. 2001) (dismissing a challenge to the validity of SAMs because plaintiff "was required to exhaust all of his administrative remedies before seeking judicial consideration of his claims"); Savage v. U.S. Dep't of Just., No. 21-1057 (CKK), 2022 WL 2982170, at *5 (D.D.C. July 28, 2022) (same); Tsarnaev v. Garland, No. 21-CV-00010-MEH, 2022 WL 2077949, at *1 (D. Colo. June 9, 2022) (same); Abdulmutallab v. Barr, No. 17-CV-02493-RM-KMT, 2019 WL 4463282, at *7 (D. Colo. Sept. 18, 2019) (same).

10

In an attempt to distinguish these cases, the defendant argues that exhaustion is required only for post-conviction inmates, not those seeking pretrial relief.  See Def. Br. 3-4.   At least two courts in this district have concurred.   See United States v. Guzman Loera, 09 CR 466, Dkt. No. 71 at *3 (E.D.N.Y. May. 4, 2017) (Cogan, J.) (holding that "motions for relief within the context of an already pending prosecution" do not constitute "actions" under the PLRA for which exhaustion is required);[8] United States v. Mohamed, 103 F. Supp. 3d 281, 286 (E.D.N.Y. 2015) (Kuntz, J.) (same).   However, this Court expressly rejected that argument in United States v. Khan, finding no distinction between pretrial and post-trial inmates with respect to exhaustion under the PLRA.   540 F. Supp. 2d at 349 (dismissing challenge to conditions in Special Housing Unit for failure to exhaust).   Specifically, this Court found: "The Supreme Court, in holding that the PLRA's exhaustion requirement applies to 'all inmate suits about prison life,' did not distinguish between pretrial and post-trial detainees." Id. (quoting Porter, 534 U.S. at 532).   See also United States v. Ali, 396 F. Supp. 2d 703, 704 (E.D. Va. 2005) (dismissing pretrial inmate's challenge to SAMs for failure to exhaust); United States v. Troya, No. 06-80171-Cr., 2008 WL 2537145 (S.D. Fla. June 24, 2008) (same).   In any event, the defendant is not a pretrial inmate.

---

[8] In Guzman Loera, the court further found that because 28 C.F.R. § 501.3(e) provides that "[t]he affected inmate may seek review of any special restrictions imposed . . . through the Administrative Remedy Program," exhaustion was not mandatory for those seeking to challenge SAMs.   See Guzman Loera, 09 CR 466, Dkt. No. 71 at *4 (quoting 28 C.F.R. § 501.3(e).   Several sister courts have rejected that argument.   See Savage v. U.S. Dep't of Just., No. 21-1057 (CKK), 2022 WL 2982170, at *8 (D.D.C. July 28, 2022) ("[T]he use of the word 'may' in § 501.3(e) does not render the [Administrative Remedy Program's] four-step process optional because, under the PLRA, all available remedies must be exhausted."); see also Johnson v. Thyng, 369 F. App'x 144, 147-48 (1st Cir. 2010) (finding that a remedy that "may" be pursued is still an "available" remedy under the PLRA for purposes of exhaustion); Owens v. Keeling, 461 F.3d 763, 770 n.4 (6th Cir. 2006) (finding exhaustion mandatory under the PLRA even where the statute provided that a prisoner "may appeal a classification action").

He was convicted pursuant to a guilty plea on January 25, 2023 and is scheduled to be sentenced on August 8, 2023.

Notably, the defendant has filed no requests under the Administrative Remedy Program and has provided no explanation for his failure to do so. The defendant's list of challenges to his conditions of confinement includes precisely the kinds of claims contemplated by the Administrative Remedy Program, and hence, as other courts have found, they are more effectively and efficiently addressed in the first instance by the BOP. See, e.g., Al-Marri, 239 F. Supp. 2d at 367. Indeed, many of the defendant's complaints have little to do with the SAMs and seem to have already been remedied or are the subject of factual dispute. For example, the defendant claims, "[t]he light is always on." Def. Br. at 2. However, the BOP advised that, per policy, lights in the defendant's unit are off between 9:30 p.m. and 6:30 a.m. The defendant also claims he "has not been permitted to have a full commissary list" and that he is never brought outside to see daylight. See id. Yet, the BOP advised that the commissary list is available to him on a weekly basis—he made purchases from it as recently as June 21, 2023—and he spends time in the recreation area outside, including as recently as last week. Here, the Administrative Remedy Program would serve as a meaningful mechanism to the extent the defendant has requests or seeks clarification regarding, among other things, commissary, his ability to use the recreation area, and the lighting of his cell.

With respect to Family Calls, the defendant claims the MDC has failed to provide him with a minimum of one Family Call per month as required under the SAMs. Def. Br. at 2. However, as detailed above, between August 2022 and June 2023, with just one exception, the defendant had at least one, and often two, Family Calls each month. See supra p. 7-8. Nothing

12

in the SAMs prevents the defendant from requesting, or the BOP from authorizing, additional Family Calls each month.

Therefore, based on the holdings of the Supreme Court, the Second Circuit, and this Court, as well as the plain language of the PLRA, the Court should dismiss the defendant's motion without prejudice to allow for the exhaustion of administrative remedies.

## II.     The SAMs Are Appropriate and Are Being Constitutionally Implemented

The defendant argues that because he pled guilty, no factual basis for the SAMs can exist, and accordingly their continued implementation infringes upon his due process right under the Fifth Amendment.   <u>See</u> Def. Br. at 6-7; Def. Supp. Br. at 2-3.   However, the defendant's conduct over the past few months does little to obviate the danger he poses, as demonstrated by his history of brutality over the past two decades.   The SAMs here are warranted because they are reasonably related to the government's interest in preventing the defendant from contacting persons associated with the CDG, and certain other third parties, who could cause death or serious bodily injury to those believed to have cooperated with the government, anticipated government witnesses, and their respective families, among others.   In addition, no reasonable alternative exists.   Accordingly, the SAMs do not infringe on the defendant's constitutional rights and the Court should reject the defendant's motion.

### A.     The SAMs Are Constitutional and Valid Under Established Law

Restrictive conditions of pretrial detention pass constitutional muster so long as they are administrative rather than punitive in nature.   <u>See</u> <u>United States v. Salerno</u>, 481 U.S. 739, 746-51 (1987); <u>Bell v. Wolfish</u>, 441 U.S. 520, 535-40 (1979); <u>Basciano v. Lindsay</u>, 530 F. Supp. 2d 435, 445 (E.D.N.Y. 2008).   Accordingly, "[a] court must decide whether the disability

13

is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." Bell, 441 U.S. at 538; Basciano, 530 F. Supp. 2d at 444-45; see Turner v. Safley, 482 U.S. 78, 89 (1987) (upholding regulations of inmate-to-inmate communications as reasonably related to legitimate security concerns); United States v. El-Hage, 213 F.3d 74, 81 (2d Cir. 2000) (upholding similar SAMs restrictions for pretrial detainee as constitutional); United States v. Felipe, 148 F.3d 101, 110 (2d Cir. 1998) (upholding restrictions similar to SAMs as reasonable and finding no due process violation). In the absence of a detention official's express intent to punish, the court's determination "generally turns on 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].'" Basciano, 530 F. Supp. 2d at 445 (quoting Bell, 441 U.S. at 538-39). Thus, courts have found that a pretrial condition "will not amount to punishment if it is reasonably related to a legitimate governmental objective, but will if it is arbitrary or purposeless." Id. (quoting Bell, 441 U.S. at 538-39) (internal quotation marks omitted).

The Second Circuit, in reviewing whether restrictive pretrial conditions violate a defendant's due process rights, has applied the test established in Turner. In Turner, the Supreme Court identified four factors for evaluating whether a regulation relating to confinement is reasonable, specifically, whether: (1) a valid, rational connection exists between the regulation and the purported government interest; (2) alternative means of exercising the constitutional right at issue remain available; (3) accommodation of the right asserted by the prisoner will have a significant impact on the prisoner's fellow inmates, prison staff, or prison resources; and (4) there is an absence of ready alternatives to the regulation. Turner, 482 U.S. at 89-91; see also El-Hage,

14

213 F.3d at 81 (recognizing four-factor test in Turner as the standard by which the SAMs restrictions should be reviewed); Guzman Loera, 09 CR 466, Dkt. No. 71 at *4-5 (same).   The Court in Turner made clear that the last factor is not a "least restrictive alternatives" test: "prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint."   Turner, 482 U.S. at 90-91.   "But if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard."   Id. at 91.

The Turner Court further recognized that courts must afford prison administrators deference in managing detention facilities as "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform."   Turner, 482 U.S. at 84 (quoting Procunier v. Martinez, 416 U.S. 396, 405 (1974)).   Similarly, the Supreme Court has cautioned that, when determining whether a pretrial condition is reasonably related to a legitimate governmental objective, a court must be mindful that "[s]uch considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters."   Basciano, 530 F. Supp. 2d at 445 (quoting Bell, 441 U.S. at 540 n.23, 547).   This deference can have particular significance when the restrictions at issue have been implemented for security purposes.   See, e.g., Thornburgh v. Abbott, 490 U.S. 401, 407 (1989).

An analysis of the four factors in this case demonstrates that the SAMs are reasonable and do not impinge on the defendant's due process rights.

15

B.    The SAMs Are Reasonably Related to a Legitimate Penological Interest

The SAMs, which restrict the defendant from communicating with third parties and commingling with other inmates, are reasonably related to the legitimate penological interest in preventing the defendant from causing death or serious bodily injury to third parties, including those he believes to have cooperated with the government, thereby satisfying the first Turner factor.

In this case, the Deputy Attorney General and the Deputy Assistant Attorney General directed the BOP to implement SAMs for the defendant because they found that there was a substantial risk that the defendant's contacts with third parties, including other inmates, could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of serious bodily injury to persons.   This finding was made both before and after the defendant pled guilty.   See Ex. A at 4 (dated May 23, 2022); Ex. B at 1-2 (dated May 18, 2023).   The defendant's decade-long reign over one of the world's most violent drug trafficking and paramilitary organizations provides more than ample support for this finding.   As described above, the defendant has an established history of acting through third parties to operate his vast and violent enterprise; retaliate against those deemed disloyal, including through their torture, murder, and beheading; and silence witnesses against him, including a potential witness in this case and that individual's foreign lawyer.   See Ex. A at 2-4; Ex. B at 1-3.

The defendant contends that his "good behavior" over the last few months and his guilty plea obviate any perceived danger from his past conduct.[9]   See Def. Supp. Br. at 2.   In

---

[9]

effect, the defendant asks the Court to disregard the last two decades of the defendant's life, and consider just the last year. Yet, the defendant's character while at liberty for most of his adult life serves as a much more meaningful benchmark of the defendant's character and capacity for violence than the months he has spent incarcerated at the MDC, while subject to the SAMs. Additionally, unlike in the pretrial detention context where the question of guilt remains, here there can be no doubt as to the defendant's guilt, as he has been convicted. There is no dispute that the defendant was the leader of the CDG for more than a decade, until his capture in October 2021. See Tr. Guilty Plea at 52:18-53:2. There is no dispute that the defendant orchestrated multi-ton shipments of cocaine for ultimate importation into the United States, from which he and the CDG obtained significant income. Id. at 53:3-20, 54:6-12. And there is no dispute that under the defendant's leadership and control of the CDG, violence was used and murders were committed. Id. at 53:21-24, 54:21-25. Arguably, the defendant's guilty plea strengthens the basis for the SAMs.

The defendant also argues that because there will be no trial, there are no witnesses against whom he can retaliate. Def. Br. at 6; Def. Supp. Br. at 2. Yet, in the same breath, the defendant claims to know the identities of the anticipated government witnesses, and more disturbingly, claims he has communicated with them, "including by paying the legal fees for one of the main witnesses against him, a man whom he urged to tell the truth." Def. Supp. Br. at 2 (emphasis added). Even with the SAMs, the defendant has found means to communicate with those perceived to be working with the government. In light of the foregoing, without the SAMs, the defendant poses a significant risk to such individuals and others.

Accordingly, based upon the Deputy Attorney General and the Deputy Assistant Attorney General's findings in this case and the facts set forth above, including the fact of the defendant's conviction, there is a legitimate governmental interest in limiting the defendant's contacts and communications.   See, e.g., Basciano, 530 F. Supp. 2d at 446 (government interests in preventing defendant from harming third parties and overseeing crime family while incarcerated were legitimate); Guzman Loera, 09 CR 466, Dkt. No. 71 at *5 (government interest in preventing defendant from running cartel while incarcerated, attacking perceived cooperators, and escaping from prison were legitimate).   Moreover, the defendant's confinement conditions are reasonably related to that interest.   Specifically, restrictions on the defendant's contacts and communication with third parties are reasonably necessary to ensure that others do not pass on, whether intentionally or inadvertently, forbidden messages from the defendant to third parties. See Turner, 482 U.S. at 93 ("In any event, prisoners could easily write in jargon or codes to prevent detection of their real messages."); see also United States v. Johnson, 223 F.3d 665, 673 (7th Cir. 2000) ("And we know that anyone who has access to a telephone or is permitted to receive visitors may be able to transmit a lethal message in code.").   The Second Circuit has affirmed similar conditions of confinement—where a defendant's contacts were largely limited to prison employees, defense counsel, and five approved individuals—in an effort to prevent the defendant from communicating with co-conspirators who were at liberty.   See El-Hage, 213 F.3d at 82.   The communication restrictions are particularly important here in light of the defendant's efforts to pass messages to family members, see PSR ¶¶ 114, 122, and communicate with an individual he believed to have been an anticipated government witness, see Def. Supp. Br. at 2.

18

In sum, because the government implemented the SAMs to address the substantial security concerns posed by the defendant, and the SAMs are reasonably related to those serious concerns, the SAMs should be upheld as constitutional.

C.      The Other *Turner* Factors Also Support Maintaining the SAMs

    The remaining three <u>Turner</u> factors also weigh against vacating the SAMs, because: (i) the BOP can address many of the defendant's complaints without vacating or modifying the SAMs; (ii) placing the defendant in the general prison population would create a significant safety risk and require an incredible expenditure of BOP resources; and (iii) there are no obvious alternatives to the SAMs.

First, the BOP can address many of the defendant's complaints without Court intervention, let alone vacating the SAMs.   For example, the defendant requested "more access to his family." Def. Br. at 8.   There is nothing in the SAMs prohibiting the defendant from requesting, and the BOP from authorizing, more Family Calls each month.[10]  <u>See</u> Ex. A at 10, ¶ 3a.   Additionally, the defendant has requested an order requiring the BOP to treat ███ ████████████████████████████████████████████████████████ Def. Br. at 3, 8.  As an initial matter, it is unclear that further treatment is required.   As detailed in the PSR, ███████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

---

[10]  Under the SAMs, the defendant is also entitled to have family visitors, <u>see</u> Ex. A at 12, ¶ 3f, but the defendant suggests in-person visits are impracticable as his family lives in Colombia, <u>see</u> Def. Br. at 2.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  PSR ¶ 129.   In any event, nothing in the SAMs precludes the

defendant from receiving appropriate medical attention.

By contrast, vacating the SAMs and releasing the defendant, with his well-

documented history of violence, into the general prison population, would put other inmates and

prison guards at risk and strain prison resources beyond measure.   In light of the defendant's

notoriety and role as the leader of the one of the most powerful drug trafficking and paramilitary

organizations in Colombia, the resources needed to monitor the defendant's communications with

other inmates—who may, for example, try to curry favor with the defendant by performing acts of

violence on his behalf—would be impossible for the BOP to provide.   See Basicano, 530 F.

Supp. at 449 (acknowledging that attempting to monitor defendant's communications in general

population would have significant impact on prison resources and thus weigh in favor of

maintaining restrictive conditions).   There are no alternative means to address the penological

concerns presented by the incarceration of this uniquely powerful and violent defendant, and the

defendant has suggested none.

III.    The SAMs Restrictions Are Prisoner-Specific

The defendant claims that the SAMs restrictions are not specific to his

circumstances in light of his guilty plea, and thus should be vacated.   See Def. Br. at 6.   But the

SAMs restrictions imposed on the defendant specifically address the concerns outlined by the

Deputy Attorney General and Deputy Assistant Attorney General in the SAMs memoranda

prepared both before and after the defendant's guilty plea.   See Ex. A at 1-4, 17-18; Ex. B. at 2-4,

17-18.   There is nothing to suggest that the SAMs need to be tailored to address only the

defendant's conduct while he has been incarcerated in connection with the instant case.   Indeed,

the government should not have to wait for the defendant to undertake further violent actions to justify the SAMs restrictions.   Rather, the SAMs restrictions are designed to prevent death or serious injury, and accordingly should be tailored in light of the defendant's history, characteristics, and prior conduct, all of which substantiate the risk that the defendant will continue to cause harm to others.   See Guzman Loera, 09 CR 466, Dkt. No. 71 at *10 ("In imposing the SAMs, the Government necessarily had to draft them to be broader than simply what the Government believes defendant has already allegedly done—the Government had to contemplate other scenarios where a defendant could effect violence from his cell and include those as well.").   Accordingly, the SAMs restrictions are specifically tailored to address the defendant's extremely serious and dangerous behavior and should be upheld.

IV.   The Defendant is Not Entitled to an Evidentiary Hearing

The defendant "requests an evidentiary hearing pursuant to Turner."   See Def. Br. at 1, 8.   However, Turner did not involve an evidentiary hearing and nothing in the case suggests the defendant is entitled to one.   The remaining two cases the defendant cites, United States v. El-Hage and United States v. Hashmi, likewise provide no support for his request.   See Def. Br. at 1, 8.   In El-Hage, the Second Circuit denied the defendant's request for an evidentiary hearing in connection with his motion for pretrial release and to vacate the SAMs, finding the parties could appropriately proceed by proffer in the context of a detention dispute.   El-Hage, 213 F.3d at 82.   And in Hashmi, the court specifically found, "In applying the Turner factors, the Court need not hold an evidentiary hearing, but may proceed by proffer."   United States v. Hashmi, 621

F. Supp. 2d 76, 86 (S.D.N.Y. 2008). Accordingly, the Court should deny the defendant's request for an evidentiary hearing.

CONCLUSION

For the forgoing reasons, the Court should deny the defendant's motion to vacate or modify the SAMs in its entirety.

Dated:      Brooklyn, New York
            June 23, 2023

Respectfully submitted,

BREON PEACE
United States Attorney
Eastern District of New York
271A Cadman Plaza East
Brooklyn, New York 11201

By:     _____
        Francisco J. Navarro
        Gillian A. Kassner
        Tara B. McGrath
        Assistant United States Attorneys
        718-254-7000