UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X

UNITED STATES OF AMERICA

-against-

DAIRO ANTONIO USUGA DAVID,

Cr. No. 14-625 (DLI)
Cr. No. 23-21 (DLI)
Cr. No. 23-27 (DLI)

Defendant.

--------------------------------------------------------------------X


## SENTENCING MEMORANDUM
## ON BEHALF OF DAIRO ANTONIO USUGA DAVID

### *PARTIAL SEALING REQUESTED*

Alexei Schacht, Esq.
123 West 94th Street
New York, New York 10025
Tel: (646) 729-8180
Fax: (212) 504-8341
alexei@schachtlaw.net

Paul R. Nalven
Attorney At Law
43 West 43 Street, Suite 59
New York, New York 10036
Tel: (212) 616-5540
Cell: (201) 323-6083
Nalvenlaw@yahoo.com

Bielka Tortorelli, Esq.
457 West 57th Street
New York, New York 10019
Tel: 917-582-3104
Fax: 718-889-6080
tortorellilaw@gmail.com

## TABLE OF CONTENTS

PRELIMINARY STATEMENT                                                     3

INTRODUCTION-CASE BACKGROUND                       3

MR. USUGA'S CHILDHOOD AND CRIMINAL
CONDUCT PRIOR TO HIS ARREST                                 4

CASE HISTORY                                                   7

THE PRESENTENCE INVESTIGATION REPORT            9

THE RELEVANT STATUTORY AND CASE LAW           10

ANALYSIS OF THE SENTENCING FACTORS            11

███████████████████████████████████████     20

CONCLUSION:                                               23

EXHIBITS

    A.  Report of Melissa Lang LMSW

    B.  Organizational Charts

    C.  Order Related to Mr. Usuga's Extradition

    D.  Letters submitted on Mr. Usuga's behalf

    E.  Press Release about Luis Hernando Gomez-Bustamante

    F.  Press Release about Daniel Barrera Barrera

    G.  Pamphlet about the Colombian Special Jurisdiction for Peace (JEP)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

UNITED STATES OF AMERICA

                -against-

                                        Cr. No. 14-625 (DLI)

DAIRO ANTONIO USUGA DAVID,

                       Defendant.
-------------------------------------------------------------------X

**PRELIMINARY STATEMENT**

       Undersigned counsel, on behalf of Dairo Antonio Usuga David ("Mr. Usuga"), submit this memorandum to aid the Court in determining the appropriate sentence in his case. As detailed below, we believe that a non-Guidelines sentence of no more than 25 years' imprisonment is fair, reasonable, and justified.

**INTRODUCTION – CASE BACKGROUND**

       For over eight years Mr. Usuga was the leader of the Clan del Golfo (CDG), a paramilitary organization in Colombia involved in drug trafficking. He deserves serious punishment for his crimes. But the Court should temper that punishment by considering that Mr. Usuga grew up in an impoverished environment where there was little opportunity for advancement, constant internecine violence, and a notable absence of the Colombian state in the most fundamental aspects of daily life. In that milieu, Marxist guerilas tormented Mr. Usuga's family and later forced him to fight as a child soldier in the internal conflict that divided Colombia over political ideology. Moreover, unlike similarly situated defendants, Mr. Usuga promptly accepted responsibility for his crimes ███████████████████████

3

███████████████████████████████████████████

███████████████████████████████████████

In addition, Mr. Usuga is a sick, 51-year-old man in need of medical care whose extradition from Colombia was conditioned upon his not receiving a life sentence. Finally, the Colombian government authorized Mr. Usuga's extradition based on the understanding that he faced punishment solely for drug trafficking offenses. This is principally because Mr. Usuga was already convicted in Colombia for his violent offenses and faces additional incarceration there for those crimes.

This Memorandum first addresses facts about Mr. Usuga's life and conflict-related activities and then explains why an analysis of the sentencing factors justifies a 25-year prison term.

**MR. USUGA'S CHILDHOOD AND CRIMINAL CONDUCT PRIOR TO HIS ARREST**

Mr. Usuga was born in Turbo, Colombia in 1971. Turbo is a port city located close to the Colombian-Panamian border. Because of Turbo's proximity to the lawless jungle of the Darién gap, the area has historically attracted its share of illicit activity. But Turbo became doubly dangerous when, because of its major supply routes to the Caribbean and Panama, it became a guerilla stronghold in the 1970s and 1980s. Luckily, seven of Mr. Usuga's eight siblings are still alive despite growing up on the front lines of Colombia's internal (Juan de Dios Usuga David a/k/a Giovani, an older brother, was killed by police in 2012). Mr. Usuga was a poor, but content child reared in a large farming family. The main problem his family had was that, like many Colombians at that time, the area where they lived was under the control of guerilla forces at war with the Colombian state.

Mr. Usuga's family was not immune from the violence that surrounded them.. Indeed, he witnessed the guerillas brutalize and traumatize his family during his childhood in the Urabá region. Mr. Usuga's sister described the guerrillas as "blood suckers" who repeatedly tied up and humiliated their father in his children's presence. Mr. Usuga's early years were marred by "fear and sadness" (Exhibit A, at pages 4-5 of the mitigation report of Melissa Lang, LMSW).

There was little access to education in the Urubá region during Mr. Usuga's childhood. He worked on the family farm and started attending elementary school when he was eight years old. (Exhibit A, at page 5). The nearest school was two hours away by mule. He frequently missed classes because of river floods, bad weather, and impassible roads.  Unsurprisingly, Mr. Usuga described his time in school as "short lived." (Exhibit A, at page 5). After completing the fourth grade, he left school to work on the family farm. He was 12 years old.

During this time, it was common for guerrilla groups to force the young sons of farming families to join their ranks. The price of resistance could be (and often was) fatal. When Mr. Usuga was only six years old, the Fuerzas Armadas Revolucionarias de Colombia (FARC), or the Armed Revolutionary Forces of Colombia, a Marxist guerrilla group, conscripted his brother Fernando. This was a sad foreshadowing of what awaited him.

When Mr. Usuga was 16, the Ejercito Popular de Liberacion (EPL), or the Popular Liberation Army, a leftist guerilla group and the FARC's rival, forced him to join their ranks. (The EPL also took Mr. Usuga's older brother Giovanni.) There was no real choice in the matter. Mr. Usuga belonged to the EPL. But the EPL was neither popular nor interested in liberation: rather, it was a violent anti-government group. Mr. Usuga was yet another young soul

conscripted into the Colombian internal conflict that would come to destroy his life before it ever really began.

Mr. Usuga was a member of the EPL from 1987 until 1991 when he demobilized. Life in the EPL, particularly for teenage recruits, was hard. EPL leadership would make the younger soldiers go days without food to prepare them for the rigors of jungle warfare. Mr. Usuga was beaten if he fell out of a training run or was too slow. He witnessed atrocious violence and engaged in gun battles almost immediately. As a young, low-ranking member of this heavily armed and uniformed group, Mr. Usuga was constantly fighting. The experience traumatized him. The things Mr. Usuga experienced as a child would have haunted even the most hardened adults: he recollects seeing farmers with slit throats lying lifeless on the roadside, dragging dead guerillas back in the jungle after they were killed in firefights, and witnessing young guerillas slaughtered by their own leaders after being caught trying to return home (Exhibit A at page 7). Mr. Usaga quickly became disillusioned with life in the EPL. For all the EPL's anti-government rhetoric, their leaders were just as corrupt as the politicians they railed against. When the EPL dissolved in 1991, Mr. Usuga was grateful to return home alive. But the long-term damage that this experience inflicted on him is incalculable and undoubtedly played a part in the crimes he later committed, which is explained in greater detail in Ms. Lang's mitigation report (*see* Exhibit A at page 8 (discussing how Mr. Usuga's former involvement with the EPL made him and his family a target for both guerilla and paramilitary groups and forced him to reenter the conflict later to protect his family)).

After demobilization, Mr. Usuga returned to his family farm for a time. But in 1997, he joined the Autodefensas Campesinas de Cordoba y Uraba (ACCU) which was part of the

6

Autodefensas Unidas de Colombia (AUC) (or United Self-defense of Colombia). The AUC assigned him a junior commander position because he already had experience as an adolescent fighting for the EPL. The AUC was a right-wing military and political group that purportedly defended against the left-wing guerrilla forces who it perceived abused rural farmers or "campesinos" like the Usuga family. Much like their FARC enemies, the AUC trafficked drugs mainly by "taxing" the rural laboratories where cocaine was produced or organizations that transported drugs through its territories.

Mr. Usuga left the AUC and demobilized in 2005.  But in 2008, he joined the Autodefensas Gaitanista de Colombia (AGC), a paramilitary group founded in 2006 by co-defendant Daniel Rendon-Herrera a/k/a Don Mario, and Mr. Usuga's deceased brother Giovani. Attached as Exhibit B to this Memorandum are a series of charts that show the evolution of the leadership of the ACCU, AUC and AGC over time. These charts are helpful because they show that Rendon-Herrera and Mr. Usuga had comparable criminal histories within the AGC.

**CASE HISTORY**

Mr. Usuga was arrested in Colombia on October 23, 2021, and extradited to the United States on about May 4, 2022, to face charges in separate indictments in three districts:  the Eastern District of New York, the Southern District of Florida, and the Southern District of New York. The latter two indictments were transferred under Federal Rule of Criminal Procedure 20 and are consolidated before this Court.

On about January 25, 2023, Mr. Usuga pleaded guilty before the Court to count one of the Eastern District of New York Indictment (14 Cr. 625[S-4]) charging him with operating a Continuing Criminal Enterprise (CCE) in violation of 21 U.S.C § 848(a). He also pleaded guilty

to Count Two of the former Southern District of Florida indictment (23 Cr. 021[S-1]) for his role in a Maritime Narcotics Conspiracy in violation of 46 U.S.C § 7056(a) and 21 U.S.C § 960(b)(1)(B). Finally, Mr. Usuga pleaded guilty to the former Southern District of New York indictment (23 Cr. 027[S-3]) for his participation in a Narcotics Importation Conspiracy in violation of 21 U.S.C § 963 and 21 U.S.C § 960(b)(1)(B).

Because of the conditions placed upon Mr. Usuga's extradition, the government removed CCE violation number 45 from the Eastern District of New York case as well as the murders committed by the CDG from 2003 until 2021. Colombian authorities have already convicted Mr. Usuga for his violent conduct, including the now-excluded crimes in the CCE indictment from this district. Mr. Usuga has been sentenced in Colombia to centuries in prison. So, while we recognize the difference between prosecution for a crime and sentencing for relevant conduct, the clear intent of the Colombian government in its extradition agreement with the United States was that the latter should prosecute Mr. Usuga for only his drug trafficking activity and not for the same crimes for which Colombian courts have already sentenced him.

From 2012 until his arrest on October 23, 2021, Mr. Usuga was the leader of the CDG. He took over that leadership role from his now imprisoned co-defendant in the Eastern District of New York indictment, Daniel Rendon-Hererra a/k/a Don Mario. After Mr. Usuga's arrest, the leadership of the CDG splintered (https://insightcrime.org/news/united-stand-divided-fall-urabenos-losing-grip-colombia/), and one leader was murdered. The remaining leaders appear to be in a struggle for control. *See* https://insightcrime.org/news/murder-gaitanista-leader-shows-internal-divisions-ahead-colombia-peace-talks/. Mr. Usuga no longer exerts any control over the CDG.

8

**THE PRESENTENCE INVESTIGATION REPORT**

According to the Presentence Investigation Report ("PSR"), Mr. Usuga's total offense level is 43 (*see* ¶ 104 of the PSR), which results in a suggested guideline level of life in prison.

Mr. Usuga has no objections to the PSR's Guidelines calculation. Moreover, at the time of his guilty plea and in his statement to the Probation Department (*see* ¶ 71 of the PSR), Mr. Usuga fully accepted responsibility for his crimes, including violence, although the elements of the crimes to which he pleaded guilty did not require him to do so.

Admittedly, the Guidelines are not criminal charges, so it is proper for a sentencing court to enhance Mr. Usuga's sentence for drug related violence where there are no violent crimes charged in the indictment. As is the case here, these enhancements can lead to a Guidelines level of lifetime imprisonment. Even so, the PSR recognizes that the Government has agreed not to seek a life sentence in compliance with its extradition agreement with Colombia (*see* page 31, footnote 2 of the PSR).

In this case, however, we ask the Court to not impose a life sentence or an effective life sentence (*e.g.*, the 40-year sentence recommended in the PSR) and instead vary downward to a 25-year prison term. Such a sentence is sufficient but not greater than necessary based on the mitigating factors in this case: Namely, Mr. Usuga's childhood trauma of being forced to fight for a leftist guerilla group that would foreshadow his future, his poor health after years of jungle combat in harsh living conditions, ███████████████████████████████████ ████████████████████████ These factors support our request for a downwardly variant 25-year prison sentence.

9

In addition, we ask your Honor to consider that the Colombian Minister of Law and Justice at the time of Mr. Usuga's extradition, Wilson Ruiz Orejuela, issued a resolution advising that Mr. Usuga should not be prosecuted in the United States for any violent conduct (*see* Exhibit C, original in Spanish and English translation prepared by the Colombian government as part of the extradition). As mentioned above, we recognize that this resolution does not bind the Court at sentencing, however, fairness, lenity, and the principles of comity between nations suggest that the Court should follow it.

**THE RELEVANT STATUTORY AND CASE LAW**

Of course, a "sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (*en banc*). But courts must consider each of the factors set forth in 18 U.S.C. § 3553(a) to make an individualized sentencing determination. *See United States v. Booker*, 543 U.S. 220, 245-46 (2005); *Gall v. United States*, 552 U.S. 38, 59 (2007). The Court should begin by calculating the applicable Sentencing Guidelines range. However, "[t]he Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009). Rather than relying on the Guidelines, a sentencing court must make an individualized assessment as to the appropriate sentence based on the facts presented considering each of the factors set forth in § 3553(a).

To determine a sentence that best comports with these goals, the Court should consider: (1) the nature and circumstances of the offense and the history and characteristics of the offender; (2) the kinds of sentences available; (3) the sentencing range established in the Sentencing Guidelines; (4) policy statements issued by the Sentencing Commission; (6) the need

to avoid unwarranted sentence disparities among similarly situated defendants; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a)(1), (a)(3)-(7).

The Court may impose a non-Guidelines sentence based entirely on policy considerations, including disagreements with the Guidelines. *Kimbrough v. United States*, 552 U.S. 85, 101 (2007). This is particularly true when considering Guidelines that are not based on the Sentencing Commission's traditional empirical and experiential study. *See id*. at 109. Section 3553(a)(2) states that the purposes of sentencing are: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Lastly, the Court is to consider all the sentencing factors of 18 USC § 3553(a) and impose a sentence which is reasonable and not greater than necessary to achieve the sentencing objectives set forth in 18 USC § 3553(a). As set forth more fully below, we believe there are factors worthy of this Court's consideration in fashioning a below-guidelines sentence of 25 years' imprisonment.


**ANALYSIS OF THE SENTENCING FACTORS**

In the present case, the Court should consider the following factors when determining what sentence is sufficient, but not greater than necessary, to satisfy the purposes of sentencing:

i)      <u>**Nature and Circumstances of the Offense**</u>.

The criminal conduct in this case is serious. Mr. Usuga pleaded guilty to engaging in drug trafficking and its associated violence for years. He fully accepts responsibility and makes no excuses for his conduct. But Mr. Usuga's offense conduct was related to his life as a paramilitary leader — not a conventional drug trafficker whose motives and actions are principally profit driven. As mentioned above, the CDG earned money primarily by taxing drug dealers, and not by making, transporting, or selling cocaine.

To be clear, Mr. Usuga earned money for the CDG and personally profited through this taxation system, and he was also an occasional owner of portions of larger drug shipments. But while Mr. Usuga no doubt profited handsomely from drug-trafficking, he did not lead a lavish much less a middle-class lifestyle. Rather, he often lived in knee-deep mud, wearing rubber boots, and trying to avoid mosquitos in a jungle encampment. In other words, traditional greed did not motivate Mr. Usuga so much as a desire to protect himself, his relatives, and his community. After spending his youth powerless and afraid, the feeling of empowerment Mr. Usuga derived from his efforts to protect his loved ones and community, however misguided, spurred his illicit activities.

### ii)   <u>History and Characteristics of Mr. Usuga</u>

Mr. Usuga grew up as a poor farmer with a fourth-grade education. He left elementary school to work at his parents' farm while still a child. When he was 16, guerillas kidnapped him at gunpoint to conscript him as a combatant. It is apparent from talking to Mr. Usuga that this early traumatic experience sent him down a road that caused him to be a paramilitary soldier and leader for most of his adult life. Mr. Usuga does not offer this background as an excuse but rather

12

as context so that the Court can better understand the man who will appear before Your Honor for sentencing.

To that end, as discussed earlier, defense counsel commissioned a report by an expert mitigation specialist, Melissa Lang, who frequently submits reports on behalf of defendants in this district. The mitigation report is attached as Exhibit A. We hope that the information in Ms. Lang's report will assist the Court in better understanding Mr. Usuga's life and perhaps why he finds himself in his current legal situation in the United States.

Mr. Usuga sorely misses his wife and family. He knows that he will not see them for years — if ever. He is prepared for this. Mr. Usuga further accepts that he must be punished and that he deserves to be punished. That is partly why he quickly pleaded guilty.

So that the Court may have a fuller picture of who Mr. Usuga is, we have attached as Exhibit D numerous letters (with translations from the original Spanish) from family, friends and members of the Colombian community, and others that collectively portray a more nuanced and accurate picture of him. These letters show that Mr. Usuga is loved, generous, and caring, and not simply the negative character portrayed in the media.

### iii)     The Sentence Range, Types of Sentences that are Available and any Policy Statements and the Need for the Sentence Imposed to Promote Certain Statutory objectives.

The Court must sentence Mr. Usuga to an additional prison term. The minimum possible sentence is 20 years under the relevant statute. His Guidelines range is life in prison. Nevertheless, the question for the Court is, as always, what sentence is fair and reasonable and serves the 18 U.S.C. 3353(a) statutory goals.

Mr. Usuga needs medical care. He suffers from at least three health conditions: (1) an Umbilical Hernia; (2) Two bilateral inguinal (groin) hernias; and (3) Intestinal Hemorrhoids. Mr. Usuga has not received medical treatment while in U.S. Bureau of Prisons ("BOP") custody. And staff at the Metropolitan Detention Center (where Mr. Usuga has been detained in extreme solitary confinement since his extradition – he was also held in Colombia in total isolation), has not responded to defense counsel's repeated requests concerning treatment. Moreover, only after the Court intervened on Mr. Usuga's behalf to order the BOP to provide medical treatment did medical professionals diagnose the above conditions. Given these circumstances, we further request that the Court, in addition to the sentencing judgment, order the BOP to provide Mr. Usuga appropriate medical care and treatment without delay.

A sentence greater than 20 years' imprisonment will protect the public from Mr. Usuga so that factor is satisfied by a 25-year prison term. And Mr. Usuga will be deported to Colombia after he serves his sentence, which further diminishes the necessity of a long prison sentence to protect the public. As for deterrence, a simple thought experiment proves that our proposed sentence is sufficient: would a rational person trade being able to commit the charged crimes knowing that he or she would have to serve 25 years in prison. The answer is certainly that this hypothetical person would be deterred, particularly considering the stringent conditions of confinement that Mr. Usuga is currently subject to. Indeed, were a person not deterred by this hypothetical trade then there is no sentence greater than 25 years that would deter them.

Moreover, at least one court in this district, relying on expert testimony at the sentencing hearing, determined that the deterrent effect of criminal sanctions are specific to the risks of detection rather than the length of the prison term. *See United States v. Lawrence*, 254 F. Supp.

3d 441, 447 (E.D.N.Y. May 23, 2017) (summarizing expert testimony that "[t]he fact that defendant was apprehended and has already served a term of incarceration will provide more specific deterrence than would any additional term of incarceration"). A sentence more than 25-years would serve little deterrent effect given that Mr. Usuga's capture and incarceration, more than the overall length of his sentence, will serve the greatest deterrent effect. *Id*. ("The key to both general and specific deterrence is the known risk of detection and punishment, not the length of the sentence."). Further, such a sentence may amount to life in prison for a sick, 51-year-old man whose had scant access to health care during his adult life.

At bottom, the Court will contemplate the following question at sentencing: would a 25-year sentence reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense? The defense submits that yes — it would. Certainly, the Colombian government, who extradited Mr. Usuga on the condition that the United States would prosecute him as a drug trafficker and not for internal Colombian conflict-related violence, would not have included that limitation if it thought otherwise.

In addition, defendants in this district accused of equally serious conduct have received sentences of ten years or less when they cooperate. And while Mr. Usuga has not benefitted from a sentence reduction for substantial assistance to U.S. officials, a look at two defendants who did demonstrates that in comparison to them, a 25-year sentence here would be reasonable.

Javier Antonio Calle Serna a/k/a Combatiente a/k/a Comba, 06 Cr. 091 (EDNY), controlled the Cali, Colombia crime world, including the drug business there, for several years prior to his incarceration. Calle Serna personally conducted, and ordered, murders of law enforcement members and informants. Even when detained at MDC Brooklyn, Calle Serna's

criminality did not abate. He bribed a jail guard to bring codefendants with whom he had separation orders to meet him in the medical unit so that he could question them about their cooperation and confabulate proffer statements. Calle Serna was sentenced to only 120 months in prison after receiving a government-sponsored sentence reduction despite obstructing justice while cooperating.

And Luis Caicedo-Velandia, 2010 Cr. 288 (EDNY) and 2008 Cr. 152 (MDFL), after leaving his life as a corrupt police officer, became one of the biggest traffickers in the world. *See* https://www.reuters.com/article/us-spain-drugs/spain-busts-colombian-drug-cartels-money-laundering-idUSTRE76P5JF20110726. He also bribed the same jail guard in MDC Brooklyn as Calle Serna, yet he too received a substantial assistance sentence reduction.

In sum, a sentence of 25 years would serve all the purposes of sentencing and follow the dictates of 18 U.S.C. § 3553 (a).

### iv)  <u>The Need to Avoid Unwarranted Disparities Between Defendants' Sentences</u>

Particularly relevant here is the fact that the Court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). While all cases are different and all defendants within a case are unique, the principle of non-disparate sentencing is an important one, and we believe that it should warrant careful consideration. Put simply, Mr. Usuga should not receive a sentence greater than equally or more culpable defendants. To aid the Court we describe similar cases below that we ask the Court to use as points of comparison.

Luis Hernando Gomez-Bustamante a/k/a Rasguno, was a top leader of the Norte Valle Cartel in Colombia. According to former United States Attorney and now Judge Roslynn R.

16

Mauskopf, Rasguno was "the 'Pablo Escobar' of his generation – a violent and ruthless drug trafficker whose organization flooded our streets with cocaine" (*see* Exhibit E). According to the Government the Norte Valle Cartel was responsible for sending over half the total amount of cocaine to the United States. *Id.* "The cartel members allegedly employed violence and brutality to further the organization's goals, including the murder of rivals, individuals who failed to pay for cocaine, and associates who were suspected to be working as informants for law enforcement." *Id.* Gomez-Bustamante received a sentence of 30 years in prison.

As the Court is aware, Daniel Rendon-Herrera a/k/a "Don Mario" was sentenced to 35 years' imprisonment. But the Court sentenced Rendon-Herrera for providing material support to a terrorist organization, a crime of violence that the Government did not prosecute Mr. Usuga for. And although the two men's conduct was similar, it bears mentioning that Mr. Rendon-Herrera was the founder of the AGC whereas Mr. Usuga inherited the leadership role from him. So there is no basis to adopt the Government's evidence-free reasoning that our client is somehow more culpable than Rendon-Herrera.

The life trajectories of Mr. Usuga and Rendon-Herrera are distinguishable. We have heard Colombian defense attorneys make the distinction between a "narco-para" and a "para-narco." A narco-para is a DTO leader or high-supervisory level trafficker that, through the offer of financial incentives, buys or gains a "franquicia" (franchise) in an autodefensas or paramilitary group often motivated by:

(1) The promise of being able to stage and execute bulk cocaine trafficking activities from a paramilitary-controlled zone where there is less likelihood of detection and enforcement by Colombian police agencies; and

(2) The possibility of "hiding" among actual leaders of armed NGOs that are being considered for leniency and negotiations by the Colombian government.

Para-narcos are historic, legacy actors caught up in the cycle of violence in Colombia over the last three generations, who are gradually integrated into the trafficking world through "taxing" of drug movements/shipments until they are at the level of being fully indictable under American conspiracy law.

There are historical references for the narco-para scenario such as Francisco Javier Zuluaga a/k/a "Gordo Lindo" who is widely known to have purchased/procured his command position in the AUC's "Bloque Calima" before being extradited to the United States. "Los Mellizos", Victor Mejia Munera and his twin brother Manuel Mejia Munera obtained their AUC franchise Bloque Vencedores de Arauca in this fashion. Victor was shot and killed by a police sniper during an arrest procedure and Miguel was extradited to the United States.

Rendon Herrera was an historic bulk cocaine laboratory operator way before integrating into the AUC's "Bloque Centauro" where he met Mr. Usuga, then a military commander doing anti-guerilla operations with and aided by the Colombian Ejercito (national army). Mr. Usuga was a child soldier in the EPL Maoist guerrilla faction and was demobilized by the Colombian army directly into the ACCU paramilitary faction, where he first experienced the taxing and protection of cocaine laboratories and operation of overland routes. These two defendants arrived at their present status in starkly different ways; Rendon Herrera acted with pure intentionality.

Another set of cases that are helpful comparators in analyzing this case involve the group of AUC leaders who were extradited on the same day in May of 2008. Most of these men, the AUC leaders at the time, were prosecuted in Federal court in the District of Columbia. At that

time the AUC was divided into different "bloques" or blocks and the main block commanders were Rodrigo Tovar Pupo, Miguel Mejia-Munera and Hernan Giraldo Serna.

Rodrigo Tovar Pupo a/k/a Jorge 40 was the leader of the Northern Block of the AUC. He and his leadership level co-conspirators sent many thousands of kilograms of cocaine from Colombia to the United States. He also "taxed" drug traffickers like Mr. Usuga and earned money himself and for the paramilitary group of which he was a leader. *United States v. Rodrigo Tovar Pupo*, Crim. No. 04-114 (RBW). Far from fully accepting responsibility or cooperating with the Government, he twice tried unsuccessfully to withdraw his guilty plea, arguing that his lawyers suffered from conflicts of interest. Yet, he was still sentenced to only 198 months in prison.

Another notorious co-defendant, named Hernan Giraldo Serna, who really only cooperated against Jorge 40, *see United States v. Hernan Geraldo Serna,* Crim. No. 04-114 (RBW), was also sentenced to only 198 months in prison.

The three founders of the AUC were the brothers Carlos, Fidel and Vicente Castano and Salvatore Mancuso. Mancuso cooperated with the Government, received the benefit of a 5K motion and received a sentence of 190 months in prison. *United States v. Salvatore Mancuso*, Crim. No. 02-388 (ESH). And this was despite the fact he was one of the ultimate leaders at the time that the AUC committed multiple mass murders of innocent civilians as part of their conspiracy. *See* Docket entry # 149 (Statement of Facts in Support of Defendant's Plea of Guilty) of *United States v. Salvatore Mancuso*, Crim. No. 02-388 (ESH).

Obviously, cases are different but these men all belonged to the same organization and committed basically the same actual crimes as Mr. Usuga and received much lower sentences than what we are seeking.

Lastly, Daniel Barrera Barrera a/k/a Loco Barrera was an upper echelon drug trafficker and rival of Mr. Usuga who worked with both the AUC and the FARC (*see* Exhibit F). Along with his partners Luis Caicedo-Velandia and Julio Lozano, they created the largest drug trafficking organization in the world, known as the Bogota Cartel. Mr. Barrera received a sentence of 35 years, which reflects his role in a larger and more successful drug trafficking enterprise than Mr. Usuga. So it is not clear why the Government deems Mr. Usuga deserving of ten more years in jail than Mr. Barrera Barrera.

### v)      The Need to Provide Restitution to any Victims of the Offense

Because there are no identifiable victims (*see* ¶ 69 of the PSR), there is no need to provide restitution in this case. In Colombia, however, Mr. Usuga has participated in the peace process as determined by the Special Jurisdiction for Peace (JEP), the justice component of the Comprehensive System for Truth, Justice, Reparation, and Nonrepetition provided for in the 2016 peace accord with the FARC. The JEP has created an English-language pamphlet that provides a good description of this process; the defense has included it as Exhibit G for the Court's review (*see* Exhibit G).

The reconciliation process in Colombia is on-going. Mr. Usuga is willing and desirous to participate in the peace process so that he can make amends through his words and deeds (Mr. Usuga stands ready to make financial reparations to those personally affected by his conflict-related activities).

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████

Finally, Mr. Usuga has been more forthright about his personal finances with the Government than others who sought substantial assistance reductions and who misrepresented

21

their assets. Mr. Usuga has admitted to holding significant assets in Colombia (*see* ¶ 141 of the PSR). Don Mario told the Court that he had no assets and needed a court appointed lawyer. Luis Caicedo Velandia also feigned poverty and alleged that he forfeited all his wealth to the authorities. It was later discovered that Caicedo Velandia had retained a sizable fortune and had used it to return to drug trafficking immediately upon his release from custody.

Altogether, the Court should consider Mr. Usuga's sincere remorse and attempts to ██████████████████ participate in the Colombian peace process as further support for the requested downward variance.

**CONCLUSION**

Mr. Usuga will likely perish in prison. As noted earlier, he faces a significant prison term in Colombia upon completion of his sentence in the United States. But the difference between Mr. Usuga dying in isolation in a far-off American prison and his spending the end of his life in a Colombian prison where his family can visit him and where he can communicate with them more frequently, is what is truly at stake here. Mr. Usuga prays that the Court will allow him to spend his final days in Colombia so that he might say goodbye to his loved ones in person with a humanity that was stolen from him years ago as a teenage soldier in the jungle. The Court has the power to make Mr. Usuga's hope a possibility. And that possibility will sustain him through decades of imprisonment thousands of miles away from the ones he loves.

For the above reasons, we believe that a sentence of 25 years' imprisonment is fair, reasonable, and appropriate in this case.

Respectfully submitted,

**/s/ Alexei Schacht**

Alexei Schacht, Esq.
123 West 94th Street
New York, New York 10025
Tel: (646) 729-8180
Fax: (212) 504--8341
alexei@schachtlaw.net

Paul R. Nalven
Attorney At Law
43 West 43 Street, Suite 59
New York, New York 10036

23

Tel: (212) 616-5540
Cell: (201) 323-6083
Nalvenlaw@yahoo.com

Bielka Tortorelli, Esq.
457 West 57th Street
New York, New York 10019
Tel: 917-582-3104
Fax: 718-889-6080

Dated:          July 31, 2023